UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA,          :
                                   :  Case No. 94-CR-00196-AB-1
                    Plaintiff,     :
                                   :
          vs.                      :  Philadelphia, Pennsylvania
                                   :  May 7, 2025
MELVIN WILLIAMS,                   :  10:41 a.m.
                                   :
                    Defendant.     :
                                   :
. . . . . . . . . . . . . . . . . .:
```

TRANSCRIPT OF RESENTENCING HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT COURT JUDGE

<u>APPEARANCES:</u>

| | |
|---|---|
| For the Plaintiff: | Robert A. Zauzmer, Esq. |
| | Kwambina Coker, Esq. |
| For the Defendant: | U.S. Attorney's Office |
| | 615 Chestnut Street |
| | Philadelphia, PA  19106 |
| | |
| | Lawrence J. Bozzelli, Esq. |
| | The Bozzelli Law Firm |
| | 211 N. 13th Street, Suite 701 |
| | Philadelphia, PA  19107 |
| | |
| Court Recorder: | Joseph Walton |
| | Clerk's Office |
| | U.S. District Court |
| | |
| Transcription Service: | Jessica B. Cahill, CER/CET-708 |
| | Maukele Transcribers, LLC |
| | 467 Maukele Place |
| | Wailuku, Maui, HI  96793 |
| | Telephone: (808)298-8633 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

MAY 7, 2025                                      10:41 A.M.

THE COURT:  We're here today in the matter of the United States vs Melvin Williams, criminal action number 94-196-1.  And I recognize the presence of Melvin Williams.  Good morning.

THE DEFENDANT: Good morning, Ms. Brody.

THE COURT:  His lawyer, Mr. Bozzelli.

MR. BOZZELLI:  Good morning, Your Honor.

THE COURT:  For the Government.  Mr. Coker.

MR. COKER:  Good morning, Your Honor.

THE COURT:  And Mr. Zauzmer.

MR. ZAUZMER:  Good morning, Your Honor.

THE COURT:  And Ms. Maier for the Probation Department.

THE PROBATION OFFICER:  Good morning, Your Honor.

THE COURT: And, of course, I always recognize and appreciate the presence of the Marshals Service.  Good morning.

I received and reviewed the presentence report, the supplemental presentence report, and sentencing memoranda from the Government and Defense counsel.  Have you received -- you've both received copies of the presentence report, is that not correct?

MR. BOZZELLI:  Yes, Your Honor.

THE COURT:  Has the Government received copies?

MR. ZAUZMER:  Yes, Your Honor.

THE COURT:  Okay.  Have you had an opportunity to

discuss it -- discuss it with Mr. Williams?

MR. BOZZELLI:  Yes, Your Honor.

THE COURT:  All right.  Any corrections?

MR. BOZZELLI:  No, Your Honor.

THE COURT:  For the Government?

MR. ZAUZMER:  No, Your Honor.

THE COURT:  I adopt the findings of the presentence report.  I recognize that although the sentencing guidelines are no longer mandatory, I must consider them in connection with all the factors set forth in 18 U.S.C. Section 3553(a).

Accordingly, I must determine the applicable guideline range and consider the applicable policy statements.  Having done so, I must determine the facts appropriate for imposing a reasonable sentence that is either a guideline sentence or non guideline sentence.

I find that the offense level is 40.  The criminal history is 6.  That places the Defendant in Criminal History Category 3.  And the guideline range is in terms of sentence of incarceration is 360 months to life.  Anyone wish to testify -- any further testimony today?

MR. BOZZELLI:  Judge, we had a few sentencing hearings, so I would incorporate -- do you prefer me to sit or stand, Your Honor?  Does it --

THE COURT:  All right.  Well, is somebody here for the Defense?

MR. BOZZELLI:  Well, we have multiple people here from the Defense.  When I came in, there was five people here.

THE COURT:  Well, why don't they introduce themselves and tell me their relationship?

MR. BOZZELLI:  Yes.

THE COURT:  Why don't they -- why don't you have them introduce themselves.  You have to speak loudly.

MR. BOZZELLI:  If I may, the woman sitting next to Mr. Sims and then we'll go down, can you please identify yourself for the record?

MS. HENRY:  Hi, it's Virginia Henry.

THE COURT:  And your relationship to the Defendant?

MS. HENRY:  Close friend.  I testified last time.

THE COURT:  Okay.  That's fine.  We want to have to put it on the record.  Yeah.

MR. SWIFT:  Nathaniel Swift.  Close friend.

THE COURT:  Close friend.  Okay.

MR. REESE:  Brant Reese, cousin.

MR. HENDERSON:  Ronnie Henderson, his uncle.

THE COURT:  I can't hear you.

MR. HENDERSON:  Ronnie Henderson, his uncle.

THE COURT:  What did he say?

MR. BOZZELLI:  Mr. Henderson, his uncle.

THE COURT:  Oh, his uncle.  Okay.  You have to speak loudly because you don't have a microphone.

MR. YOUNG:  Michael Young, cousin.

THE COURT:  Okay.

MS. ROBINSON:  Tanisha Robinson, close friend.

THE COURT:  I didn't hear -- I didn't hear that.

MS. ROBINSON:  Tanisha Robinson, a close friend.

THE COURT:  Close friend.

MR. BOZZELLI:  Ms. Robinson.  Yeah, close friend.

MR. MONROE:  Ronnie Monroe, close friend.

MR. SIMS:  Ruben Sims, close friend.

THE COURT:  Okay.  Were you in prison with him?

MR. SIMS:  Absolutely.

THE COURT:  Were all of you in prison?  Which ones of you were in prison with him?  Okay.  Okay.  Thank you.

MR. BOZZELLI:  And I believe almost all, except for one, at some point testified; is that correct?  Naturally, Your Honor, I would incorporate their testimony as well as previous arguments into this sentencing hearing.

THE COURT:  All right.  Mr. Zauzmer or Mr. Coker, do you wish to be heard on sentencing?

MR. ZAUZMER:  Yes, Your Honor.

THE COURT:  Why don't you step forward and come into the mic so that I can hear you?

MR. ZAUZMER:  Good morning again, Your Honor.

THE COURT:  Probably more important that the record can hear you.

MR. ZAUZMER:  No, I think it's more important that you can hear me, Your Honor.  So, Your Honor, first, before I give my remarks to remind the Court, Richard Macko is here, who is the FBI agent who was wounded.

THE COURT:  Oh, yes.  Of course.  He testified last time.

MR. ZAUZMER:  He testified.  And when he first appeared before the court, he expressed -- and in our original submission, he expressed the view that Mr. Williams sentence should not be reduced.  He subsequently sent a letter to the Court that I'm sure you'll recall, in which he --

THE COURT:  Yes, I read that. Exactly.

MR. ZAUZMER:  -- he changed his view and suggested that he believes that Mr. Williams has reformed and that he should receive a sentencing reduction.  The Court can hear from him further, if you want about that, or if not --

THE COURT:  No, I'll accept the representation of what he put in his letter.  That's fine.

MR. ZAUZMER:  Okay.  Now, with respect to the Government's view, Your Honor, I have to respectfully, very respectfully disagree with Agent Macko's view.

THE COURT:  Okay.

MR. ZAUZMER:  I've known Richard Macko for 25 years.  I am proud to consider him a friend, and I think that he's one of the finest examples of law enforcement that we've had in this

district.  And, I think, Your Honor has seen that personally. And I think the care and compassion that he brings to thinking about this case in which he was the victim really exhibits that more.

THE COURT:  Well, certainly, getting that kind of acknowledgment from you is a big compliment, and I certainly accept it and want to -- you know, I want to say to you that I appreciate it and appreciate your being here and your thoughts. Okay.

MR. ZAUZMER:  And I think it's to his tremendous credit that even though he was so seriously wounded and despite what his family went through, that he looks at this with compassion now. I still, of course, have to represent the Government here and represent our view in cases across the board.  And in our view, with again, great respect to Agent Macko, there is not a basis for a sentence reduction in this case.  Your Honor just found that the guideline range, just starting with that, we know it's advisory, but the guideline range is 360 months to life, meaning that it essentially hasn't changed materially.  Notwithstanding Your Honor's ruling, that one 924(c) Count goes away.  The range previously started at 384 months, and Judge Green imposed that sentence.  The current range of 360 months to life still would embrace that same three hundred --

THE COURT:  Was his a mandatory sentence?

MR. ZAUZMER:  The guidelines were mandatory, at that

time.

THE COURT:  That's what I thought.  Yeah.

MR. ZAUZMER:  Now, of course, the other interesting thing here -- and I have a number of remarks, so please excuse me if I jump around a little bit.

But, you know, the other interesting thing here is that the 32 year sentence that Judge Green imposed ended in 2022.  Mr. Williams would be free now but for the fact that he committed an escape offense.  That Judge Younge imposed a consecutive sentence of 22 months.  That was mandatory also at the time.

And then he had the prison guard assault in 2006.  Now, at that time, the guidelines were advisory.  And the federal judge in Louisiana determined to give him a 151 month sentence, consecutive.  That was at the top of the guideline range, which was then advisory.  It's because of that 151 month sentence that Mr. Williams is still in prison.

THE COURT:  That we're here today.

MR. ZAUZMER:  So he has served the 32 year sentence. And the problem is -- and I credit that he's done very well in recent years and I credit Dr. Halburn's view.  But the fact of the matter is he did really poorly for many, many, many years, including that really nasty assault on a prison guard that took place.  He had over 40 infractions over about a 20, 25 year period.  That's really unusual.

As Your Honor knows, I do all the post conviction work

in the District, also in much of the rest of the country looking at cases.  And so I've seen thousands of inmate disciplinary reports.  This is unusual.  Prison officials don't write up people every day.  To get 45 infractions puts you maybe in the upper one or two percent.  And so this was a very serious record. And it's the reason we're still here.

The other thing that's odd about this is that the reason we're here is because of the elimination of the 924(c) Count, which is what gives him the opportunity for resentencing. I'm sorry.  We are not contesting Your Honor's ruling, the legal ruling there, but now it's within your discretion as to what to do.  And we have to recognize that the basis of this sentencing challenge is rather absurd.

It, of course, is all based on the categorical approach, this odd doctrine that we evaluate the nature of a crime as violent not based on what this person did, but based on whether somebody else could commit the same offense and do it without violence.  And it's not just me talking.  Judge Roth, in a Third Circuit dissent recently had a really terrific line.  She said the categorical approach has as many critics as there are judges.  It's lower court judges who are speaking out against the absurdity of this, even though it is what the Supreme Court has interpreted and that Congress has mandated.

But when you get to the final stage of sentencing, which is where we're at right now, the Court is entitled and

expected to look at the actual facts and to look at everything about the Defendant's character and history.  And so when we break it down now, what happened here?  This 924(c) Count was based on four predicate crimes.  The conspiracy to commit robbery, the assault on the federal agents, which was broken down into four counts.  Your Honor, you know, very thorough, careful opinion determined that three of those four predicates, excuse me --

THE COURT:  You want a second?

MR. ZAUZMER:  Okay.  So three of those four predicates are still valid crimes of violence under Section 924(c).  The one that's not is the conspiracy.  Why?  Because somebody else could agree to engage in a conspiracy and not get to the stage of violence.  And so because of the categorical approach, nobody qualifies under 924(c) for a conspiracy offense, no matter how violent.

The conspiracy offense here, now that we're at this final stage, is as violent as it gets.  What that conspiracy to commit Hobbs Act robbery was, was embracing a year of scores of armed robberies of drug dealers that Mr. Williams and his group engaged in.

So this case involves actual violence over a long period of time.  That's the conspiracy charge and yet, that's what gets him off of the 92(c) charge gets him back today.  At the end of the day, when we stand here at sentencing, we just see

no reason to change the sentence in a case like this, again, with respect to Agent Macko's view.

The other thing, and the last thing I'll say about the sentencing calculations before some final thoughts, is that the guideline range today, if the crimes were committed today, is actually even higher. After Mr. Williams committed his offenses in 1994, the Sentencing Commission raised the guidelines in a couple ways at the urging of Congress. The guidelines are higher for the assault on agents and the guidelines are higher for an assault that's specifically directed at law enforcement.

The guideline range, if we were dealing with a post 2004 situation, would be life. It would simply be life. He would be well over offense level 43. That's what we know about the current view of Congress and the Sentencing Commission about the crimes that were committed here of shooting at and seriously wounding FBI agents. The criminal conduct here is just as serious as it gets.

And so, again, in a normal sentencing proceeding, we just don't see any reason for a sentence outside the guideline range. The only way in which he can get material relief at this point would be for Your Honor to significantly lower the 32 year sentence. Now again, he finished that sentence, but you would have to lower it so that when BOP starts running the consecutive terms of 22 months and 151 months, it gets him some kind of relief. We just don't think that's warranted and really have not

seen something like that in a case like this.

Again, to give him credit, he has matured. We don't dispute Dr. Halburn's view. I don't think Dr. Halburn's report adds an awful lot. To me it read more like a Defense memo summarizing what everyone has said on his behalf.

The one thing that really jumps out to me from that report and from everything else in these proceedings we've been doing this now for years, is the continuous adamant refusal to accept responsibility by Mr. Williams. He will not admit what he did. He will not -- I mean, his apology to Agent Macko was I'm sorry for what you went through. You know, the sort of third person apology as opposed to I'm sorry for what I did, which he has never said.

Instead, he bombarded this Court for years, even in the last year with just really frivolous legal arguments challenging the conviction and the jury's finding from many years ago. Really two juries, I mean, he had two trials because the first judgment was vacated. And two juries concluded beyond a reasonable doubt that he did what he did and he won't accept responsibility. That's a serious concern.

It's to his credit that he has support of friends and family who've been here every time. There's a little bit about that -- and we've briefed this to Your Honor; there's a little bit here that doesn't quite fit.

His mother testified to you and it was pretty clear

that she essentially had no knowledge of what he was doing as a young man.  She testified to you that he was a fine person who, you know, might have met the wrong people.  You know, not knowing at all what he was doing over a multi-year period.

THE COURT:  She was his mother.

MR. ZAUZMER:  She was his mother, and she cares about him, and she didn't know what's happening.  And she -- and that's a problem.  His wife, we're told -- I mean, that's a really strange situation.  Obviously, she's devoted to him and we hope she can help him, but she lives in the Netherlands.  She's not -- she doesn't have permission to live continuously in the United States.

She's given very inconsistent stories.  She testified to Your Honor that she met him online 11 or 12 years ago and then they then got married.  She told the Bureau of Prisons, when she was applying to visit that she met him as an infant and that they grew up together on the same street, and they've known each other for close to 40 years and then got reacquainted in the last --

THE COURT:  Do I have that as part of the record?

MR. ZAUZMER:  You do.  We submitted the attachments in a pleading to Your Honor.

THE COURT:  Okay.

MR. ZAUZMER:  And so -- and I know it's been a while.  So just to refresh your recollection.  And another point that we pointed out in our papers is they are not married.  He has been

incarcerated since 1994.  In order to be married, while a federal -- one can be married as a federal inmate, but it requires permission from BOP, which actually is not difficult to get.  BOP has a procedure for it.  But he hasn't been married.  It's not in their records.  He's never applied.  The ceremony would have been in prison.  There would be a record of it.  They're not married.  And yet, they've continually told the Court and the Probation Office that they are.

THE COURT:  Well, a lot of people do that.  You know that.

MR. ZAUZMER:  I don't know.  You know what?  This is a new one.

THE COURT:  Oh, wow.  You and I live in a different world.

MR. ZAUZMER:  I can't recall, and maybe Mr. Coker will correct me.

THE COURT:  I don't say that about people from prison. I don't know about that.

MR. ZAUZMER:  I mean, certainly there --

THE COURT:  I'm talking about the world outside.

MR. ZAUZMER:  -- certainly there are common law marriages --

THE COURT:  Yeah.

MR. ZAUZMER:  -- but I have not had the experience of someone who's an inmate saying that they got married in prison.

THE COURT: Oh, that's a different story. I have not either.

MR. ZAUZMER: But what's also of concern, of course, is the inconsistent stories that Ms. Abdi (phonetic), in applying to visit Mr. Williams in prison again told BOP that they've known each other for 35 years, that she's a friend, and made all these other submissions that we attached in our pleadings to Your Honor. Completely different from the story that's told in court.

So, yes, he has support, but, again, he is someone who has not accepted responsibility, somebody who is appropriately subject to these very long sentences, somebody who is serving the sentence right now, a 12 year sentence for an assault on a prison guard in Louisiana who was significantly injured. In all of these circumstances, it really is beyond me as to why there would be a reduction.

It's been my fortune or misfortune to handle these categorical approach matters for the U.S. Attorney's Office. When the Supreme Court's decision came out in Johnson 10 years ago, we had over 300 people who were seeking new sentences, and we've been working our way through those cases. A lot of them went away based on Third Circuit and Supreme Court rulings as to what qualifies as a crime of violence. But there are probably about 100 people who are going to resentencing. Many of them are receiving the same sentence they did before based on similar arguments. Some have received something of a break.

This would really be an outlier, Your Honor, to be very frank. To have a sentence like this for such an egregiously violent crime, followed by a crime committed in prison where -- and this is what's most unusual, the sentence is still within the guideline range. Most of those 100 cases I'm talking about where a 924(c) Count or an ACCA charge has been eliminated because of the categorical approach, the guidelines drop significantly. And sometimes the statutory sentences drop significantly, especially where you had someone who committed multiple 924(c)s.

Here, the range doesn't change at all. Statutory ranges don't change. With all due respect, given the nature of the case, the nature of the Defendant, the seriousness of the offenses, we respectfully suggest that the Court reinstate the same sentence of 384 months, or at minimum go down no lower than the current of the bottom -- the bottom of the current guideline range, you know, which is 360 months, which would give him a two year break when the BOP does all the math. But that would be our recommendation and that there's just no basis for leniency beyond that.

THE COURT: Okay.

MR. ZAUZMER: Thank you.

THE COURT: All right. Mr. Bozzelli.

MR. BOZZELLI: Thank you, Judge. Your Honor, I'm getting to a point in my career where I often threaten to write a book, and I think --

THE COURT: Why don't you speak into the mic?

MR. ZAUZMER: Sure.

MR. BOZZELLI: Where I often contemplate writing a book. It's how long we've all been doing it. But, you know, certain cases would go in that book and this case would go in that book.

When you look at the factors -- and I am going to give you -- ask for a sentence of leniency. Every factor, in my humble opinion, points to leniency in this situation for Mr. Williams. If you look at the four factors that the courts analyze as far as what the purpose of a sentence is. Of course, naturally, one of the first is retribution, where the Court stands in alignment with the victim. One of the reasons why I believe this should go in the book is I've never seen this.

I've never seen an agent -- Agent Macko come in at one hearing and say he needs to serve every minute in prison. And then to his credit, have an epiphany and say, as he said in his letter, I was moved by his mother's testimony, I was moved by his son's testimony to have his father back in his life. I was moved by Mr. Williams, who was polite, intelligent and determined and talked through some of the legal motions.

And as the agent says, Agent Macko, he apologized to me for the harm he caused my family, and I accept this apology as a sincere effort on his behalf. Agent Macko says in conclusion, and its document 499, I've talked this over with my wife and she

agrees with me that we cannot in good conscience support incarcerating Melvin Williams any longer.  So God willing, Melvin Williams will be granted the freedom he seeks.

So in that regard, when you're looking at that angle, again, I think it takes a very strong man to say what Agent Macko did, to come around and say, you know what, enough is enough.  So that's the one factor that I ask Your Honor to consider.

The other thing is rehabilitation.  Again, I love movies and the one scene that comes back to me which is echoed in my conversations with him is the Shawshank Redemption.  I don't know if Your Honor watched movies or ever seen it, but I'm very close in age to Mr. Williams.  I was, you know, a sophomore, maybe a junior, watching this movie at the University of Pennsylvania on loop.  I loved it.  I remembered it.  At that time, he was going through his trial.

At the end of the movie, they're talking to Morgan Freeman's character and they say, do you feel as though you've been rehabilitated?  To which his response is, what are you asking?  Are you asking if I'm sorry?  Are you asking me if I regret what I did?

And as Melvin Williams will tell you, if I believe he's going to have a chance to speak again, not a day goes by that I don't regret what I did.  I wish I could go back and talk to that 19-year-old kid.  Talk something sense into him, tell him the way the world works.  He's like, but I think back to that 18-year-old

kid the way I was then, stupid, foolish.  That 18-year-old kid is long gone.  All that's left is this middle aged man, right?  And he does regret every day of his life what he did for the past 31 years that he's been in jail.

The other point, when you talk about incapacitation deterrence is something Your Honor mentioned, which was a good point that I didn't pick up on.  I would defy anyone to explain to me, after 31 years -- Mr. Zauzmer's asking for some more time -- to what extent does five, six more years matter?  Is someone going to look at this case and say 31 years, that's nothing but 34 years, oh, I wouldn't commit that crime.

If a man hasn't been rehabilitated after 31 years in jail, are four or five more years going to change him?  Of course not.  He is the man he is now.  And that's why I look at Dr. Halburn's report.  Of course Mr. Zauzmer is going to say, well, it reads like a Defense memo.  I'm sure if it was painted in a different light he'd be lauding its praises.  But the reality is we had Dr. Halburn do this for a reason.  We want to figure out who this man is.  Is he the man that he says he is now or is he that foolish 19-year-old kid?  And this clearly says that he's not.

Mr. Zauzmer points out, oh, he's had 46 documented infractions.  Well, on page 7 of the report it says most of these incidents took place when he was younger, during the earlier years of his incarceration.  This is mostly consistent with

inmate discipline data which lists that out of a total 46 documented infractions over the course of 30 years, 19 of these infractions occurred during Williams first five years of incarceration. And some of these infractions are not violent. They include having a cell phone or not following an order.

But what this report emphasizes is the strong support that he has. I mean, every time you come, the row is filled with people. I did receive an email from Ms. Abdi who says, I wish I could come. You know, it's not cheap to get over here. I wish I could be there, but I can't make it. And tell Judge Brody I wish I was here, right.

You know, as far as these reports -- and I don't know why Mr. Zauzmer attacks the family and thinks that's relevant, I don't know. But as far as being married to visit, I spoke to her, and if I recall correctly, I mean, there was a time where the Bureau of Prison said only specific people can visit. Can't be a girlfriend, can't be a fiancé. You have to be a wife or I think, children. That was a couple years ago.

So is it possible that maybe she said she was married, or is it possible there's a Muslim marriage or religious marriage? I don't know. But how that's relevant to his sentence, I'm not quite sure. You know, you talk about the conspiracy. Oh, this was a vast conspiracy of violent crimes.

There's a lot of material I've read over when I accepted the case. My understanding is that there was never, in

the testimony of the witnesses, given ever any testimony of, well, who did you rob?  Oh, we robbed Big Joe.  We robbed this guy.  It was just this, well, we were planning to rob these people.  I think the witness was cross-examined.  Well, you know, where did these robberies take place?  Street corners?  I don't remember, right.  So for this vast violent conspiracy the prosecutor speaks about, I don't think it was supported by the evidence.

What I see, Your Honor, is an individual who, again  -- and when you look at what he's done in this report, and again, that's why we continued the last time it says he talks, he's taken as many classes as he can.  He's trying to better himself; he's trying to become a better person.  And when he leaves, he's got this support system.  He's got the people behind him, some of them who have been incarcerated, who, as they say in here, will be a support for him, right.

I mean, listen, he wants to live out the rest of his life like we all do.  What deterrent at this point in time?  I can't imagine.  I wouldn't jaywalk if I were him.  And he wouldn't either.  To go back after serving 31 years of his life, everything that he missed.  Understandably -- understandably, the crime itself, it was a violent crime.  No doubt about it, obviously.

But what I would ask the Court to consider in light of Dr. Halburn's report, in light of the support that he has, in

light of, you know, how he performed on the test that he was given, I would ask the Court to consider a sentence that is a variance. It would be a -- I'm asking the Court -- the maximum statutory, I think, on the most serious charge is 20 years. I'm asking the Court to impose 15 years on that as well as to run every other one concurrent for a total of 15 years, because it's my hope that the Court will, in light of how he's been recently, the changed man that he is will allow him to be released.

One other thing, I don't know about the Louisiana case. I've spoken to my client about it. I hear there's another side, which is again referenced in Dr. Halburn's report. Just for the record, I'll mark that as D-1, Your Honor, and ask to enter it into evidence, that talks about -- that the guard was sexually assaulting my client and that this was more of a retaliation. I think Your Honor had mentioned something about the Louisiana case, that maybe there would be more credibility if it was tried and sentenced here. I think that I wrote notes about that.

But the point of the story is I'm asking Your Honor for this sentence. I think it is sufficient, but not greater than necessary, that would allow my client to, after 31 -- over 31 years, come back into society. Thank you.

THE COURT: Okay. Would you like to be heard?

THE DEFENDANT: Yes.

THE COURT: Why don't you come up and talk to me?

THE DEFENDANT: Yes.

THE COURT:  Make sure you speak into the microphone.  I want to make sure, as I have with the other people, heard every word.

THE DEFENDANT:  Yeah.  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Williams.

THE DEFENDANT:  Boy, finally here.  First and foremost, I spoke to my lawyer.  In fact, my lawyer came to see me last night, and we had a chance to speak and go over some things.

THE COURT:  I'm not hearing you well.

THE DEFENDANT:  I said, finally, I get -- I'm sorry.

THE COURT:  Yeah, you have to speak into the microphone so that --

THE DEFENDANT:  All right.

THE COURT:  -- I can hear you well, because this is a big courtroom.

THE DEFENDANT:  All right.  I was saying, finally I got a chance to be able to sit here and speak to you.  And I said, my lawyer came to see me last night, and we spoke on a lot of things and covered a lot of issues.  And we made the decision pretty much that we were going to kind of stay away from the legal aspect of everything and focus on the rehabilitation part and so forth.  And I told him I had no problem doing that.  He said, unless the prosecution went too into depth concerning the incidents of the case, the specific incidents of the case.

And when I sat here -- I sat here every time I get

here, And I see Mr. Zauzmer, the Prosecutor, he expounds on robberies and crimes that were committed and people were -- stuff was taken from people and stuff like that.  And if the judge and everybody looks at the counts, I am not charged with not one count of Hobbs Act robbery ever doing anything.

THE COURT:  Don't worry about the legal aspects.

THE DEFENDANT:  Okay.

THE COURT:  Talk to me about who you are and whether I -- how I should consider this now.

THE DEFENDANT:  Okay.

THE COURT:  You know, you start with your legal stuff and you're not -- you don't -- you're not equipped.  And you have to understand that nothing's going to get you out by discussing legalities.  That from our point of view as judges or lawyers, that becomes important.  The important thing is it's your person, and I want to know what makes you tick.  That's why I asked Dr. Halburn to confirm what I thought about you.  You're a smart guy.

THE DEFENDANT:  Thank you.

THE COURT:  You're a smart guy, but that's not good enough.  It's not good enough for me.  I could have been very, very smart, but that's not why I'm necessarily why I'm here.  The question is the human aspects to this.  Who are you and what makes you tick that should make me want to have you in society now, and the risks that I would be taking by allowing you to do that?

THE DEFENDANT:  Well, Your Honor, as the record reflect, I came in at 18 years old.

THE COURT:  You want to sit back there for a few minutes and get your thoughts collected; I don't mind you doing that.

THE DEFENDANT:  I think I'm all right, Your Honor.  I just --

THE COURT:  That's okay.

THE DEFENDANT:  As I said, I've been here in prison since 18 years old for this crime.  And throughout these years, like the Prosecutor pointed out, there was incident reports.

I was sent straight to a penitentiary.  I had to live according to how the penitentiary and how the penitentiaries ran in order to survive, myself, as long with a couple other brothers there, they were there with me.  That's why our bind is so close because the whole time we were able to do some things that took us away from that environment, took our mind away from that environment.

Throughout my whole process, you'll see that despite I may have got into certain incidents, where certain incidents might have occurred, but I still did things to better myself throughout this whole time.  You see, I have nearly close to 100 different classes and certificates and things like that.  I was determined, regardless of what, not to waste away in prison.

In my religion, this is such a thing that a burden in

which causes you to remember God is better than a blessing and which causes you to forget him.  The prison has been my burden, which for some reason I was taken off the street.  I was placed in prison and I paid for that with society.  I'm in prison.  I was in prison 31 years.  I had to stop trying to figure out what extent or to why I was in prison.  But regardless of what I know that it was to pick God in my life in some type of way.  And the burden was being -- having had to go through this, to pick God in my way -- in my life.  However, God has been in my life, I know that I'm ready to return to my family, friends, mothers and everybody else to assist them -- to assist myself to live out some type of life.  To have -- to have the opportunity to get a driver's permit, to get a license, to handle a cell phone, to use a computer, to get a job, to sign up to a local gym.

THE COURT:  It's not going to be easy, you know.

THE DEFENDANT:  I know.

THE COURT:  It's going to be very, very difficult.  I'm speaking to you now as a grandmother, not as a judge.

THE DEFENDANT:  Yes.

THE COURT:  It's going to be very, very difficult.  Do you understand that?

THE DEFENDANT:  Yes.  Yes.  I'm patient, though, Judge.

THE COURT:  And you understand that there's no nice legalities about it.

THE DEFENDANT:  Yeah.

THE COURT: It's going to be just be -- you're a human being, and you're coming out, and you're going to-- you're going to be -- if I do let you -- if I do sentence you so that you can be released, you understand -- you understand that it's not going to be easy for you?

THE DEFENDANT: Yes.

THE COURT: Do you understand that?

THE DEFENDANT: I'm prepared, Your Honor. I'm prepared. And believe it or not, over the last 40 days -- I believe over the last 40 days were the hardest time in the 31 years that I've been locked up because every day it was, I guess, with anxiety or the anticipation as to what life or direction my life would go. But I know regardless of what -- I prepared for this. You can pit me right now --

THE COURT: You're not going to be able to prepare because being a convicted felon in the world, which is what you will be, will be very difficult. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you think you can handle it?

THE DEFENDANT: I'm positive, Your Honor. I have an outlet, a plan that I put together and within --

THE COURT: But that plan may not work out. You understand that?

THE DEFENDANT: Yes.

THE COURT: And you have to be strong even if that plan

doesn't work out.

THE DEFENDANT:  Yes.  That's why I have my friends and family there to support me, Your Honor.  They always -- we lean on each other because sometimes I give them just as better advice in here and they're out there and I give them advice in which they utilize and they actually see it through.

So for me to get out here and them to give me advice and not follow my own advice would be real hypocritical to fall short and not do the things that I've actually been coaching and preaching to them throughout these years.  Like I said, I know it's going to be rough, but I'm prepared.

THE COURT:  Well, let me ask you something.  Do you realize that you will be monitored by a probation officer?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand -- how do you view that?  Do you think you're going to be able to handle that?

THE DEFENDANT:  I'm positive.  I've never had a problem with drugs, drinking.

THE COURT:  No, I'm not talking about drugs.  I'm talking about somebody else giving you instructions.

THE DEFENDANT:  Yes, I have no problem with that.  I have no problem with that.

THE COURT:  Even if you don't like the instructions.

THE DEFENDANT:  Your Honor, I deal with it every day. I've been down here at FDC --

THE COURT:  I don't want to see you back here.

THE DEFENDANT:  You won't see me unless I stop past just to say hi.  I'll explain to you what's going on with my circumstances.

THE COURT:  If I do -- if I do decide to impose a sentence that will release you, I would -- I'm thinking about recommending you to reentry court.  Do you know anything about that?

THE DEFENDANT:  Yes.  Mr. Reuben Sims, he went through it and he was explaining to me all the different ways that it helped him and how he finished it.  And he gave me a lot of information concerning it.  And I'm more than willing to participate because from my understanding, it's a great program. It actually helps us coming back out.  Reentry back into society.

THE COURT:  You do have to live in society.  It's just so different.  Also, you know, you've been expensive.  You've cost the Government and indirectly everyone else who has funded the Government a lot of money.  It was well over a million dollars.  I'm wondering whether or not it's wise for another couple of years to keep you in there just for that reason.  That this seems to be a burden that I'm not sure that people would want to undertake.  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And do you think you can live up to that?

THE DEFENDANT:  I'm sure I can, Your Honor.

THE COURT:  Is there anything else that you'd like to say to me?  I have so many things I want to say to you, but I'm not going to.

THE DEFENDANT:  Okay.  Just before I leave, if possible, I wanted to thank the agent because -- for writing a letter in my behalf because, I mean, when I got it that night and I prayed, I couldn't --

THE COURT:  His capacity to forgive, and I want to -- his capacity to forgive has been wonderful.  Just really, really wonderful.  I'm not sure many people would have that capacity.

THE DEFENDANT:  Yes.

THE COURT:  And you have to live up to it.  You have to say to yourself, look what he did for me.  Do you think you can be able to do that?

THE DEFENDANT:  I understand, Your Honor.  Trust me, I understand the compassion he's showing.  Any compassion in regards to the sentence you will be showing.  I know it's not a difficult thing, but as he said in his letter, and as you mentioned before, Your Honor, I'm not a waste.  I'm not -- I'm not an idiot.  I'm not someone that would go out there --

THE COURT:  I think if I let you out, I have to believe that.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  I have to believe it.  But it's going to be very tough for you.  If I let you out, it means I have confidence that you could do it because I care about that and I care about society and make sure that none of these things ever happen when you're out.

THE DEFENDANT:  Of course.

THE COURT:  Do you understand that?

THE DEFENDANT:  Of course.  Yes, Your Honor.

THE COURT:  You sure?

THE DEFENDANT:  One thousand percent positive.  Like I said, the only thing I can do is ask for two percent of your trust and I'm sure I'll gain the other 98 percent, as you'll see by me staying out there.

THE COURT:  I have to tell you; I will say to you that I have been a judge for a long -- for 40 -- altogether for 44 years.  And I've never had people coming in and saying these things.  You've obviously impacted the life of a lot of people --

THE DEFENDANT:  Yes.

THE COURT:  -- and that -- just keep that up.  Just say to yourself, it's not all about me, it's all about everyone.  Everyone around me who has been helpful to me and my life -- as difficult as my life has been.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

THE DEFENDANT:  I won't let them down or you, if given

the chance.

THE COURT:  And you also have one other thing you have to do is you have to write me a letter.

THE DEFENDANT:  Okay.

THE COURT:  In six months if I let you out telling me what you've done, okay.  And I don't want to hear anything from the Probation Department who have any question about it.  Do you understand that?

THE DEFENDANT:  You have my word, Your Honor.

THE COURT:  Okay.  All right.  You may step back.

THE DEFENDANT:  Thank you.

THE COURT:  Unless you have something else to say.

THE DEFENDANT:  I appreciate you.  I appreciate the agent and even the prosecutor and their way of prosecuting the case.  I know -- I understand it's their job.

THE COURT:  They have a different aim.  They have different considerations than you have, and I have different considerations than either one of you.  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.

THE DEFENDANT:  Thank you.

THE COURT:  You may step back.  I recognize -- I recognize that under 18 U.S.C. 3553(a), a court must impose a sentence that is sufficient but not greater than necessary.  I must consider the relevant 3553(a) factors, including the nature

and circumstances of the offense and history and characteristics of the Defendant, the kind of sentences available, the need to avoid unwarranted sentence disparities, any pertinent policy statement issued by the Sentencing Commission, and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and promote just punishment for the offense, to avoid adequate deterrence to criminal conduct, to protect the public and to protect the Defendant, and to provide the Defendant with educational or vocational training or medical care.  Those are the needs of sentencing.

From 1993 to 1994, when you were 17 to 18 years old, you were part of a group that committed armed robbery of drug dealers.

On March 16, 1994, you and two other members of the group, Jackson and Lacombe (phonetic), your cousin, planned on committing such a robbery when you were intercepted by the FBI agents.  You directed Jackson and Lacombe to shoot at the agents. Two of those agents, Macko and Turck, were hit and seriously wounded.  Your cousin was killed in the exchange of gunfire.

In 1997, a jury found you guilty of the following one count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. 1951; one count of conspiracy to assault and kill federal agents in violation of 18 U.S.C. 371; two counts of attempting to kill federal agents in violation of 18 U.S.C. 1114; two counts of assaulting, resisting and impeding federal agents

in violation of 18 U.S.C. 111; and one count of using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. 924(c) because a jury found you guilty. I respect the system and you were guilty. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: In 1998, you were sentenced to a total of 384 months imprisonment, which was the minimum sentence under the applicable guidelines, and three years of supervised release. At that time, your 924(c) conviction carried with it a mandatory minimum of 16 months in prison. This part of your sentence was ordered to run consecutive to the other parts of your sentence.

In February 11, 1998, the day after you were originally sentenced in this case, you escaped from custody. Two days later, you were caught. You pleaded guilty to escape in violation of 18 U.S.C. 759 and were sentenced to 22 months in prison to run consecutively to any other state or federal sentence.

On March 8th, 2006, when you were in the custody in Louisiana, you attacked a prison guard.

In October of 2006, a jury found you guilty of assaulting a corrections officer in violation of 18 U.S.C. 111, and you were sentenced to 150 months imprisonment to run consecutively to the two other sentences I just mentioned. Again, because a jury found you guilty. I accept this as all

true.  I know that you have an excuse for that, but that isn't relevant to me at this time of sentencing.

In addition to the two convictions we just discussed, you incurred a number of infractions while you were serving your original sentence in this case.  I will note, however, that you incurred many of these in early years of your incarceration and that younger inmates have a higher rate of infractions.  I also noted that these infractions don't tell the whole story of your time in prison.

You've also earned your GED, and there's something in here that recommends that that's what you should be doing.  But I want to note that you've already done that in prison.  You learned Spanish and Arabic.  Fortunately, you've had a judge who wants to learn Spanish and is doing terribly at it.  You dutifully practiced your faith, planned your reentry to society, and mentored other inmates.

On June 27, 2022, you finished serving your original sentence of 384 month sentence.  That same day, you began serving your sentences for the 1998 escape and the 2006 assault convictions we just discussed.  Accordingly, a revised PSR in January 2024, you have earned, as I understand it, 1,183 days of good conduct time and your minimum release date is October 10th, 2034.

In 2023, I vacated your 924(c) conviction, which is why we are here today for resentencing.  In resentencing you, I do so

de novo and take you as you are today and not as you were at the date of your offense or the date of your convictions or the date of your subsequent convictions. I will consider not only the convictions and infractions you incurred while you were incarcerated, but also the fullest information possible concerning your life and characteristics. And that is a quote from the United States Supreme Court.

I start by recognizing that you had a very difficult childhood. When you were only 8 months old, your mother, Dorothy Dobbs, moved you and your sister from Virginia to Philadelphia to escape your father after he slit her throat during an argument. Throughout your childhood, you moved five or six times and always lived in dangerous neighborhoods rife with gun violence and drug dealing.

I also recognize that the March 1994 incident had an unimaginable impact on your family and in particular your mother, who effectively lost two sons as a result of your incarceration and your cousin Jermaine's death. On top of that, I understand that your sister, Sharon Williams, was murdered just one month after you were sentenced in 1998. I also understand that your stepfather, Lloyd Dobbs, passed away last July, meaning that you are the only support your mother has left. I bring all this up not only to express my sympathy, but also because I have considered the importance of allowing you to be there for your mother in fashioning your sentence.

As you might recall, in March 2024, we held an initial hearing in connection with your resentencing.  I'm sure you remember that.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Eleven people attended to show their support.  Three of them testified on your behalf.  Your mother traveled from Virginia to testify.  She explained that she and the rest of your family are firmly committed to supporting you if and when you are released.  Your son, Hakeem Harris, who lives in Philadelphia, also testified on your behalf.  He explained that even though you have been incarcerated for most of his life, you have always been there to give him guidance.  And he looks forward to building a relationship with you, to you building a relationship with your grandsons when you get released.  Remind me, how many -- how many sons does he have?

THE DEFENDANT:  He has one.  He only has one.

THE COURT:  One child?

THE DEFENDANT:  So far, yes.

THE COURT:  Okay.  Okay.  You can anticipate more. That's okay.  Your partner, Abdan Abdi, traveled all the way from the Netherlands to testify for you.  I certainly accept the Government's representation that you're not married to her, but she --

THE DEFENDANT:  Your Honor --

THE COURT:  -- you and she certainly have had a long

term relationship.  She has indicated that she can help support you financially and will relocate to the United States if that's going to be at all possible.  I understand that when released, you will live with her, if that's feasible, or with your mother, grandmother, son or uncle.  Also, I understand that a probation officer interviewed your friend, Tashia Robinson.  Is she in court today?

MS. ROBINSON:  I'm here.

THE COURT:  Okay, that's what I thought, back in August 2024.  Ms. Robinson owns Forget Me Not Children and Youth Services, a Philadelphia based social services organization.  Are you still with that organization?

MS. ROBINSON:  I'm actually the founder and CEO.

THE COURT:  You what?

MS. ROBINSON:  I'm the founder and CEO.

Are you?  Oh, now?

MS. ROBINSON:  Yes.

THE COURT:  Okay.  She said she wants to hire you as a youth mentor in Forget Me not if you can obtain the necessary background clearances.  But if not, she will investigate other opportunities, including employment with the Philadelphia Anti-Drug/Anti-Violence Network.  She confirmed that she is working with your wife, wife in quotes, to secure employment and housing. She also said that your family has saved approximately $5,000 to help you when you're released.  Is that still true?

MS. ROBINSON: Yes.

THE COURT: Okay. We held another hearing on September 17, when again many family members and friends attempted to show their support for you. At that hearing, the Government called Agent Richard Macko, one of the two agents who was involved in testifying. I want again to -- for the Court to note that he's here in court and the Court appreciates that.

Mr. Macko spoke about the horrific impact that the shooting had on his and his wife's family. However, two days later, Mr. Macko submitted a letter. He explained in relevant part that he had spent the past two days struggling with the hearing. He said that your performance was exceptional and that you were polite, intelligent, and determined. And I'm quoting you, agent. He noted that you apologized to him for the harm caused to his family and said he accepted your apology as sincere.

He concluded the letter with the following. "I talked this over with my wife and she agrees with me that we cannot, in good conscience, support incarcerating Melvin Williams any further. My wife and I both realize it is time to turn the page. So God willing, Mr. Williams will be granted the freedom he seeks."

We held another hearing on January 23rd, where, again, many family members and friends attended and three testified to show their support. Those who testified spoke to your deep

commitment to your faith, your efforts to better and educate yourself, and how you uplifted and supported those around you even while you were incarcerated.

Based upon all the testimony I've heard over the past three hearings, it's very clear that you have a vast and strong support network here in Philadelphia and beyond.  I also note that at the January hearing, with your and the Government's willingness to do so -- that I do so, I ordered Dr. Kirk Halburn, a psychologist and professor at Drexel University, to meet and evaluate you.  I wanted someone to talk to you personally.  Did you read his report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I want to read from that report and I want as his conclusions.  Dr. Halburn mentioned the following.  "Mr. Williams has matured and improved his decision making process considerably, as reflected in the steady decline in disciplinary infractions, especially violent ones, over the past decade.  He has actively requested and engaged in available programming, including education, mental health and recreational opportunities.  He has pursued productive activities throughout his incarceration, such as studying the law.  I want a little less law from you, you understand?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  Learning new languages, practicing his faith, planning for reentering and mentoring others.  He has

static risk factors that contribute to his overhaul appraised risk and dynamic risk factors, those under control, that lessen his overall risk of reoffending, including a strong desire to lead a crime free lifestyle and positive relations with social family members and friends.  He does not present any significant mental health concerns, but is open to counseling or therapy if recommended.

He has a strong support network of family, his partner in life, although a lower distance, and friends who are committed to his post social adjustment to the community are able to support him physically, emotionally and financially and are supportive of his goal of living a life without crime.

And you have worked hard to get a concrete reentry plan.  You understand that the following are necessary, and it's going to be very difficult if I let you out to accomplish these. You understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Then these are stable housing, possible employment opportunities and financial strategies, ongoing practice of your faith and engagement with his community and with pro social peers to facilitate a successful transition to the community.  I'm glad that you spent some time thinking about all these issues and Dr. Halburn has said that you have.

I note that you will face -- as I said before and believe strongly that you will face tremendous collateral

consequences.  Do you understand what that means?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Because of your conviction, it's going to be very difficult out there.  In many ways more difficult than prison.  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Notwithstanding the support of your family and friends, your status as a convicted felon may affect the jobs you can hold, where you can live, and what benefits you can receive.  As a result, your life may well be harder on the outside compared to your life in prison where you had three meals a day and a place for bed.

These consequences may be sufficient to deter both you and others from similar conduct.  Do you understand what I just said to you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  My job is to impose a sentence that is sufficient but not greater than necessary.  So, Mr. Williams, I'm going to give you a sentence that not only reflects the seriousness of your misconduct, but also the fact that your 924(c) conviction has been vacated and offers you a chance to chart a different path from the one you were on when you were committed to underlying offenses as an 18-year-old in March 1994.

Please stand.  And now, the 17th day of September 2024, in the matter of the United States vs. Melvin Williams, number

94-196.  I sentence you to 271 months in custody to run consecutively to your imprisonment under your previous sentence -- previous state or federal sentence, three years of supervised release.  No amount of restitution because restitution is not applicable.  No fine because I find that you're unable to pay a fine and, therefore, I'm going to waive the fine.  And a special assessment, as I understand it, is $600.  This special assessment is due immediately.

Mr. Williams, you have the right to appeal this sentence within 14 days of the filing of the judgment and commitment order.  You have the right to ask your current counsel to, at the very least, file a notice of appeal and to instruct you on how to secure other counsel for your appeal.  You have the right to appointment of counsel for your appeal.

Don't ever let me see you again.  Other than writing me a letter.  Are you going to write me that letter?

THE DEFENDANT:  I promise to write you that letter.

THE COURT:  Okay.  Okay.  Good luck to you.

THE DEFENDANT:  Thank you very much, Your Honor.

THE COURT:  You're welcome.  Okay. he's reincarcerated.  Thank you.  Thank you to the Government for being here and thank you very much for your very significant impact.

THE DEPUTY CLERK:  Court's adjourned.

(Proceedings concluded at 11:44 a.m.)

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: June 10, 2025

_____
Jessica B. Cahill, CER/CET-708